**CCL SERVICE CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant,**

and

**Federal Data Corporation,
Defendant–Intervenor.**

**No. 00–361C.**

United States Court of Federal Claims.

Oct. 24, 2000.[1]

---

**1.** This opinion was issued under seal on October 6, 2000. Pursuant to ¶ 3 of the ordering language, the parties were requested to identify protected/privileged material subject to deletion. Brackets denote the deletions.

Joseph J. Petrillo, Washington, DC, for plaintiff. Karen D. Powell, Petrillo & Powell, PLLC, of counsel.

Lee J. Freedman, Washington, DC, with whom was Assistant Attorney General David W. Ogden, for defendant. Joann W. Melesky, Defense Information Systems Agency/Defense Information Technology Contracting Organization, of counsel.

David R. Hazelton, Washington, DC, for intervenor. Mark A. Klaassen and C. Thomas Powell, Latham & Watkins, of counsel.

## OPINION

MILLER, Judge.

This post-award bid protest is before the court after argument on cross-motions for summary judgment on the administrative record. The most substantial question presented is whether the awardee misrepresented the length of time that original equipment manufacturers would provide maintenance and, if so, the effect of such a misrepresentation, given that it affected only one of four evaluation criteria.

## FACTS

In 1992 the Department of Defense (the "DoD") decided to centralize its information processing centers.[2] As part of the centralization, the DoD established the Defense Information Systems Agency (the "DISA") to operate the principal information processing activity. Currently, DISA runs five mainframe processing centers ("Defense Megacenters" or "DMCs") and 18 Regional Support Activities ("RSAs"), which must remain in continuous operation.[3] DISA's DMCs and RSAs were obtaining equipment maintenance from approximately 100 different contractors, which was difficult to manage and caused costly service disruptions.

In order to increase maintenance efficiency in contract management and equipment operation, DISA issued Request for Proposal DCA 200–99–R–5011 (the "RFP") on September 3, 1999. The RFP contemplated awarding a fixed-price, indefinite-quantity, and indefinite-delivery contract for a base period of one year, with four option years. The contract would cover specified information processing centers within each of four geographic regions in the United States. The RFP reflected DISA's desire, according to defendant, for continuous service to DMCs and RSAs through preventative maintenance, precise diagnostics and prompt repair. For example, for each time a contractor failed to comply with the contractual maximum repair

time, the RFP authorized DISA to deduct a "downtime credit" of 25% of the monthly maintenance price applicable to the piece of equipment which required service.

The RFP advised that DISA reserved "the right to award to an offeror with other than the lowest price offer" and that the award would be given to the "best overall value to the Government" and enumerated the three criteria that DISA would use in its evaluation of the proposals in decreasing order of importance: Technical/Management; Past and Present Performance Risk Assessment; and Price. The RFP also divided the Technical/Management criterion into subparts as well, noting that the technical factors were more important than the management factors.[4]

The six, equally-weighted technical subcriteria were Original Equipment Manufacturer ("OEM") support, response time, repair time, technical support experience/training, diagnostics, and microcode changes. The RFP defined an OEM as "a commercially viable and accepted firm with a substantial involvement in the manufacturing and modification of Automated Data Processing Equipment."[5] The RFP stated that a contractor must have OEM agreements to provide support covering at least 65% of the equipment inventory within each region to be covered by the proposal.[6] The Government was to

2. Before the centralization each United States military department and defense agency operated its own data processing center.

3. DMCs and RSAs directly support military logistics, including the provision of food, fuel, ammunition, clothing and repair parts for all military operations throughout the world.

4. The management organization sub-criteria were management capability and commitment, management approach, and subcontracting approach.

5. It is the position of CCL Corporation ("plaintiff") that DISA modified its definition of OEM in response to specific questions, but thereafter failed to apply the new definition in its evaluation of Federal Data Corporation ("intervenor"). For example, a question from an offeror posed to DISA and published in Amendment 7 to the RFP, asked regarding:

OEM organizations [that] provide service to equipment other than those items manufac-

tured by them (thus making each organization an OEM and a third party maintainer) ... [would] DISA require these large businesses to have additional business relationships with the actual manufacturer of the equipment or will DISA accept the infrastructure established by that manufacturer in third party support of equipment contained within this solicitation?

In its response as of December 14, 1999, DISA stated that "the Government [would] require these large businesses to have additional business relationships with the actual manufacturer of the equipment." [ ]

6. The RFP further states:

All OEM agreements with the contractor must be written and co-signed and describe the relationship between the contractor and OEM to assure the Government that the OEM will respond with whatever service is necessary, to include parts, diagnostics, and expertise to effect repair. The cost of OEM assistance is the responsibility of the contractor.

If, in response to the initial maintenance call, the contractor has not diagnosed the mal-

evaluate the "breadth and depth of the OEM written and co-signed agreements furnished by each offeror." These agreements were required to "address the proposed level of OEM service ... [including] under what circumstances the OEM will be brought in for support." DISA's rationale behind the 65% OEM support requirement, discussed in a pre-bid protest concerning this RFP, was to minimize downtime in the instances where third-party maintenance providers ("TPM"s) were unable to effect repairs within the four hour time limit.[7] *See CHE Consulting, Inc.,* 2000 WL 276927 at *3 (Comp.Gen. Feb.18, 2000) (unpubl.).

With respect to pricing requirements, offerors were required to submit fixed monthly maintenance prices for equipment in all four regions for the initial year and the four option years. Price evaluation was to be based upon the total discounted life cycle cost ("DLCC") for each proposal on a per-contract line-item number ("CLIN") basis. However, the RFP advised that combined, Technical/Management and Past and Present

Performance Risk Assessment, would be significantly more important in the evaluation than Price.

The RFP's closing date for offers was November 19, 1999. CCL Service Corporation ("plaintiff") and Federal Data Corporation ("intervenor") were the only two offerors, with intervenor submitting two proposals: a primary ("FDC(P)") and an alternate ("FDC(A)"). Intervenor's two proposals differed only with respect to the maximum allowable repair time: FDC(P) proposed a four-hour repair time, whereas FDC(A) proposed three hours.[8] [ ] In addition, intervenor's proposals both stated intervenor's intent to "secure OEM support in all instances where it is available." [9]

DISA divided the labor of the proposal evaluation process among the following: the Source Selection Authority ("SSA"), Thomas F. Thoma; the Source Selection Advisory Council ("SSAC"); the Performance Risk Analysis Group ("PRAG"); the Source Selection Evaluation Board ("SSEB"), which included the Contract/Cost Evaluation Team

function and repairs initiated within the proposed repair time, the contractor must secure OEM support with OEMs for which the contractor has written agreements. If the contractor does not have a written agreement with an OEM for a failed equipment item the contractor will attempt to secure OEM support. . . .

7. Prior to the closing date for submitting proposals under the RFP, two contractors filed protests to the United States General Accounting Office (the "GAO") challenging various aspects of DISA's 65% OEM agreement requirement. *CHE Consulting, Inc. v. United States,* 2000 WL 276927 at *2 (Comp.Gen. Feb.18, 2000) (unpubl.)

8. Due to the shorter repair time, the FDC(A) proposal price exceeded the FDC(P) proposal price by more than $6.5 million.

9. Intervenor stated in the Technical Management section of its proposal:

FDC intends to secure OEM support in all instances where it is available. These support arrangements may take several forms, including maintenance agreements, per-call service agreements, and reseller/third-level support agreements. FDC has already demonstrated OEM support in the form of maintenance agreements for more than 80% of the equipment population. If OEM support is not avail-

able (e.g., the manufacturer is no longer in business, has discontinued the product line, or no longer commercially supports the product line), FDC will secure alternate maintenance providers, component manufacturers, or mechanical replacements in lieu of OEM support. FDC currently has established relationships with third-party equipment sellers and maintainers to facilitate this process.

If, in response to the initial maintenance call, FDC has not diagnosed the malfunction and repairs have not been initiated within the proposed repair time, FDC will secure OEM support.

In most cases, FDC will dispatch the OEM or its authorized service agent on the first dispatch. However, if FDC's response to the initial maintenance call has not diagnosed the malfunction and initiated repairs within the proposed repair time, FDC will exercise its OEM support arrangements at that time . . . .

. . . .

FDC will dispatch calls to our maintenance providers who have assured access to second-level maintenance support (onsite and remote) as well as agreements to access the OEM when needed. If the maintenance provider has not diagnosed the malfunction and initiated repairs within the proposed repair time, FDC will exercise its OEM support arrangements at that time, if the maintenance provider has not already done so. FDC has demonstrated its OEM support by the letters in Appendix A of this proposal.

("CET"); and the Technical/Management Evaluation Team ("T/MET"). The SSEB chairman was to document the results of the technical/management proposal evaluations in a report. Similarly, the PRAG chairman was to document its results and provide a risk assessment report. Both reports and the cost/price analysis were to be given to the SSAC, which would then analyze the evaluation results and perform a cost/technical tradeoff analysis, culminating in a SSAC Analysis Report. The SSA then was to use the SSAC Analysis Report in making the best-value selection decision.

DISA noted that both of intervenor's proposals contained significantly lower prices for the later option years and consequently asked intervenor to justify the price decrease.[10] Intervenor gave several reasons for its pricing structure, discussing its view of the cost characteristics for the differing types of equipment to be maintained, as well as the expected savings resulting from shifting from manufacturer to third-party maintainer servicing.[11] Both SSEB and CET evaluated intervenor's response and found it was "acceptable from a technical perspective."

The SSAC report filed March 29, 2000, analyzed intervenor's proposals in order to determine whether intervenor's price structure posed an unacceptable risk to DISA. The SSAC determined that the conclusion that intervenor's proposal was the best value to the Government was not outweighed by the risk associated with paying higher prices during the early years of the contract. Additionally, the SSAC factored into its risk assessment the review of intervenor's financial data from the CET's report filed March 22, 2000.[12] A financial responsibility determination was not performed on plaintiff, according to defendant, because plaintiff did not provide financial data to the contracting officer, and none could be found.[13] In addition to the aforementioned analyses of intervenor's pricing structure performed by DISA, the SSA also evaluated the risk posed by intervenor's pricing structure. The SSA found that intervenor's price proposals did not pose an unacceptable risk. Finally, the CET determined that plaintiff had the highest cost proposal in all regions with the one exception being FDC(A) in Region II, which was slightly higher.

The T/MET rated both offerors' proposals with a color-coded ranking scale: blue, green, yellow, and red. Blue denoted an exceptional rating, defined as exceeding "specified performance or capability in a beneficial way to the Government; no significant weaknesses." Green denoted an acceptable rating for a proposal that "meets the standards; any weaknesses are readily correctable." Yellow and red indicated ratings of marginal and unacceptable, respectively, but none of the three proposals received a yellow or red rating.

Plaintiff's proposal earned a green rating for every technical and management subfactor in each of the four regions. Intervenor's proposals received blue ratings for its management approach in all four regions, as well as for its OEM support in two regions. For the sub-criteria categories in which one of intervenor's proposals did not receive a blue

---

10. DISA posed the following question to intervenor in DI–X017:

   What is your basis for the proposed price reductions contained in the Option Years? Please provide adequate justification explaining your pricing methodology and support that the required service can be provided at the proposed prices. Specifically, do your proposed prices in the Option Years cover your expected costs? If so, please explain in detail. If not, provide documentation detailing what steps are being taken by you to eliminate the performance risk associated with the below cost pricing in the Option Years.

11. Intervenor explained in response to plaintiff's protest before the GAO: "[Cost] reductions result from the liquidation of parts inventories by the manufacturer and the shift from manufacturer to third-party maintainer control of the service market for the product." *CCL Service Corp.*, B–284110.6, at 8 n. 19 (GAO July 28, 2000) (advisory op.).

12. The review of intervenor's financial data showed intervenor had [ ] in cash and cash equivalents and [ ] in available credit.

13. Plaintiff disputes this fact and submitted a copy of an e-mail dated March 10, 2000, regarding financial information, supposedly sent to an agent of DISA.

rating, it received a green one. Intervenor's FDC(A) proposal earned blue ratings for repair time in all four regions.

Under the category of OEM support, the T/MET credited plaintiff with OEM maintenance support agreements for certain agreements involving TPMs that were authorized by OEMs.[14] Both plaintiff and intervenor received credit for any TPM authorized by an OEM to maintain the OEM's equipment, as though the OEM were providing the maintenance support.

In reviewing the T/MET evaluations, the SSAC concurred that both of intervenor's proposals were superior to plaintiff's proposal from a technical/management perspective, especially for intervenor's management approach in all four regions. The SSAC compared the FDC(P) proposal with plaintiff's proposal, finding that the FDC(P) proposal had a more proactive management involvement plan regarding response time. Based on the T/MET documentation, the SSAC determined that "the preponderance of strengths belong[s] to FDC(P)," and that from a technical and management perspective, the FDC(P) proposal was superior to plaintiff's. The SSAC next compared FDC(P) with FDC(A) and found that the benefit of the three-hour maximum repair time was worth the additional cost of FDC(A).

With respect to past performance, plaintiff's evaluations earned a slightly stronger low risk rating than intervenor's. However, the SSAC stated that "these slight discrepancies are not considered significant and have no impact on the overall rating of low risk." The SSAC, after its integrated assessment of the three proposals, determined in its report dated March 29, 2000, that FDC(A) would be the best overall value to the Government in all four regions.

The SSA investigated the SSAC findings before issuing his conclusion. The SSA noted that all three proposals met the minimum OEM support requirements, but that intervenor's OEM agreements covered a larger proportion of the equipment inventory in three of the four regions. Furthermore, the SSA found that intervenor had a higher percentage of exceptionally ranked OEM agreements than plaintiff. Reiterating the RFP's direction that the technical/management and past performance factors together were more important than price, the SSA agreed with the SSAC that FDC(A) was the best overall value to the Government.[15] On April 7, 2000, the SSA directed the Defense Information Technology Contracting Organization (DITCO), on behalf of DISA, to award the four regional contracts to the FDC(A) proposal.

On April 17, 2000, plaintiff filed a bid protest with the United States General Accounting Office (the "GAO"). Plaintiff's protest alleged: (1) Intervenor had engaged in an illegal "bait and switch" with respect to its proposed OEM support; (2) intervenor's pricing was illegally unbalanced; (3) DISA did not properly evaluate the offerors' technical/management proposals; and (4) DISA failed to conduct meaningful discussions. Because plaintiff announced its intent to file a complaint in this court days before the GAO was to issue its opinion, the GAO dismissed plaintiff's protest. After plaintiff filed its complaint for injunctive relief, at this court's request, the GAO issued an advisory opinion on July 28, 2000, denying plaintiff's protest entirely.

## DISCUSSION

### 1. *The administrative record*

The administrative record is a fiction. It is not to be confused with a documentary record maintained contemporaneously with the events or actions included in it. Rather, the administrative record is a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court.

---

14. DISA considered authorized TPMs equivalent to an OEM for the purposes of maintaining the OEM's equipment. Plaintiff was credited for its agreements to have [ ] provide maintenance support for AT & T and Cisco equipment, as well as [ ] providing maintenance for HP equipment.

15. The SSA also noted that the choice between FDC(P) and FDC(A) was a "closer decision" than the one between plaintiff's proposal and FDC(P).

Moreover, although presented as a motion for summary judgment, a motion for judgment on the administrative record is not a true motion for summary judgment. *See* RCFC 56.1. Summary judgment, as it implicates an administrative record, has evolved as a convenient format for arguing in court a case based on such a record. The statements and counter-statements of fact, with appropriate citations to the administrative record, argue the significance and weight accorded to the facts that were the basis for the agency decision. Thus, the central inquiry on a motion for summary judgment—whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment—has no bearing on a review of the administrative record in a bid protest. The inquiry, instead, is whether, given all the disputed and undisputed facts, a protester has met its burden of proof that an award is arbitrary, capricious, and so on, or violates to prejudicial effect an applicable procurement regulation.

Discovery and trial can intercede. The court has discretion to allow supplementation of the record in enumerated circumstances, *see GraphicData v. United States,* 37 Fed.Cl. 771 (1997), which is not revolutionary, given that the administrative record has neither the completeness nor the trustworthiness of a contemporaneous record. An administrative record is assembled after the fact of a protest. The agency gathers together the existing relevant documents and either forwards the record to the GAO, or submits it in a judicial proceeding, or both. If the GAO is the initial forum, an interesting development occurs: The "record" is supplemented with after-the-fact, self-serving, gap-filling explanations of what did or did not intrude into the decision-making process. The same supplementation can occur in a court of law, except that no advocate or jurist has the guile to transmute what is developed for court into a record that retroactively becomes the work product of the agency decision-maker. The contrary is the case regarding accretions to the record in a GAO

proceeding. The Government of late has been arguing that the record before the GAO, which may be submitted later in a court proceeding, constitutes the administrative record, such that deferential standards of review apply to the post-award documents that were generated in response to the lodging of a protest before the GAO.[16] It is a far different proposition to accord deference to a GAO decision when its rationale and analysis can be helpful, *see Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 63, 617 F.2d 590, 597 (1980), than to perpetuate the fantasy that the record before the GAO represents the metes and bounds of the administrative record on review.

Allowing discovery in a judicial proceeding signals that the administrative record, despite its having been propped up before the GAO, still has lacunae that should be filled based on the protester's challenges. An early judgment call is made. During or shortly after the hearing on an application for a temporary restraining order, and in the context of an expedited proceeding, the court must decide whether and to what extent to allow discovery. Hindsight can show that the Emperor's couturier clothed him in illusion: "There's less here than meets the eye," as T. Bankhead famously remarked. Nonetheless, the exception should not swallow the rule that discovery can be allowed upon a proper showing. The same applies to trial, which takes place when the administrative record cannot provide answers to key questions about what took place.

In response to plaintiff's protest to the GAO, intervenor produced the Declaration of Paul G. Bander, its president, which is relied on heavily by defendant and intervenor, and which particularly impressed the GAO. Mr. Bander expanded on intervenor's proposal. He gave reasons justifying acceptance of intervenor's proposal that the evaluators had not cited. Plaintiff seized on this obvious ploy as evidencing arbitrary and capricious

---

**16.** During oral argument, defendant retreated from the contention that the record before the GAO is the administrative record, although intervenor did not.

action; defendant and intervenor embraced it as further justification for the award decision.[17]

The court allowed discovery, which, on reflection, was not warranted by the gravitas of plaintiff's challenges. The court ordered intervenor and defendant to produce all of intervenor's arrangements with subcontractors, so that plaintiff could investigate whether the putative subcontractors offered what intervenor said they did and at what prices. After the cross-motions were filed and the record of the evaluation proceeding itself was examined, the court came to appreciate that the issue could be resolved based on a review of the proposals as written, the record as supplemented before award, and the evaluators' comments.

### 2. Jurisdiction and standard of review

Jurisdiction in the Court of Federal Claims is prescribed by the Tucker Act, 28 U.S.C. § 1491(b)(1) (1994 & Supp. IV 1998), which allows a protestor to challenge "the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

■ The court evaluates the procuring agency's conduct to determine whether the Government's conduct was arbitrary and capricious. See 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). To prevail under the arbitrary and capricious standard, a frustrated offeror is required to establish that (1) the government officials involved in the procurement process were without a rational and reasonable basis for their decision, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed.Cir.1996); Ellsworth Assocs., Inc. v. United States, 45 Fed.Cl. 388, 392 (1999), appeal docketed, No. 00–5028 (Fed.Cir. Dec. 10, 1999).

■ A protestor must prove the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement regulation by a preponderance of the evidence. See CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed.Cir.1988); Ellsworth, 45 Fed.Cl. at 392; R.R. Donnelley & Sons, Co. v. United States, 38 Fed.Cl. 518, 521–22 (1997); PCI/RCI v. United States, 36 Fed.Cl. 761, 767 (1996). The injunctive relief sought by a frustrated offeror is appropriate "only in extremely limited circumstances." CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir.1983). In the context of a bid protest, an agency is entitled to wide discretion in its evaluation of bids. Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed.Cir.1994); CACI Field Servs., Inc. v. United States, 13 Cl.Ct. 718, 725 (1987), aff'd, 854 F.2d 464 (Fed.Cir.1988); Ellsworth, 45 Fed.Cl. at 392. The reviewing court cannot substitute its own judgment for that of the agency. Ellsworth at 392–93. Furthermore, technical rating decisions are the "minutiae of the procurement process ... which involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed.Cir.1996).

■ The aggrieved party faces a higher burden when the negotiated procurement grants government officials a great deal of discretion. Burroughs Corp. v. United States, 223 Ct.Cl. 53, 65, 617 F.2d 590, 597–98 (1980); Beta Analytics Int'l, Inc. v. United States, 44 Fed.Cl. 131, 137 (1999). It is well established that the scoring of proposals within the competitive range falls within the discretion of the procurement officials. See Harris Data Communications, Inc. v. United States, 2 Cl.Ct. 229, 241 (1983). Thus, "'[i]n reviewing [plaintiff's] protest of the agency's technical evaluation and decision to eliminate an offeror from the competitive range, we will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation.'" Beta Analytics,

---

**17.** For example, during the GAO proceeding, the GAO attributed statements to DISA that were reformulated justifications from the Bander Dec-laration and not a part of the actual evaluation process. See Plf's Resp. to Def's Stat. of Facts, filed Sept. 25, 2000, ¶ 18.

44 Fed.Cl. at 137 (*quoting Beneco Enterprises, Inc.*, 70 Comp. Gen. 574, 576 (1991)).

### 3. *Plaintiff's protests: adequacy of DISA discussions, no material misrepresentation*

Plaintiff protests DISA's contract award to intervenor on the grounds that intervenor's pricing was illegally unbalanced, its proposals contained material misrepresentations with respect to the amount of OEM maintenance to be provided, and these misrepresentations undermine the validity of the DISA's evaluations and subsequent contract award. To prevail in its protest, plaintiff must demonstrate both that a significant error occurred in the procurement process and that the error was prejudicial. *See Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996); *see also Central Ark. Maint., Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995) (noting that in pre-award bid protest "not all violations of statute and regulation are the same; only a 'clear and prejudicial' violation of a procurement statute or regulation warrants relief"). A successful material misrepresentation claim requires plaintiff to demonstrate that (1) intervenor made a false statement regarding its intended level of OEM maintenance; (2) DISA relied on the false statement in granting the procurement award to intervenor; and (3) contractors other than the OEMs intervenor proposed, such as TPMs, are actually performing the maintenance.[18] *See Unified Arch. & Eng'g, Inc. v. United States*, 46 Fed.Cl. 56, 62 (2000); *Synetics, Inc. v. United States*, 45 Fed.Cl. 1, 15–16 (1999); *C & H Commercial Contractors, Inc. v. United States*, 35 Fed.Cl. 246, 256 (1996).

Plaintiff infers many of its arguments from intervenor's price structure. Plaintiff asserts that there is "no question that the [intervenor's] proposals are grossly front loaded," that its proposed prices will not cover costs in the later years, and that DISA performed an inadequate analysis under FAR 15.404–1(g).[19] *See* Plf's Br. filed Sept. 6, 2000, at 22–23. The main support plaintiff provides for its allegation of front-loaded pricing is a mathematical analysis of the price ranges within intervenor's proposals.[20] Plaintiff has calculated that intervenor's prices in the early contract year are "at least double its costs for the proposed maintenance services by its OEM subcontractors."[21] *Id.* at 23.

In its advisory opinion, the GAO noted:

The current provisions of the Federal Acquisition Regulation (FAR) governing unbalanced pricing in offers provide that unbalanced pricing exists when, despite an acceptable total evaluated price, applica-

---

18. If plaintiff were to prove the first two factors above, the third factor would be inapplicable in the case at bar because the GAO cases advancing that requirement deal with misrepresentations about commitments from key personnel. *See Aerospace Design & Fabrication, Inc.*, 98–1 C.D. ¶ 139 (Comp.Gen.); *Informatics, Inc.*, 78–1 C.D. ¶ 53 (Comp.Gen.); *ManTech Advanced Sys. Int'l, Inc.*, 94–1 C.D. ¶ 326 (Comp.Gen.). The allegation that an awardee has "baited" with promises to utilize named individuals or individuals specifically described, but "switched" after contract was award to less qualified personnel is not comparable to the allegation that intervenor's proposal is based on projections that do not satisfy the RFP. Obviously, plaintiff today is in no position to prove that projections made five years into the future have not occurred.

19. "Unbalanced" offers are subject to FAR § 15.404–1(g), which states that, when considering unbalanced offers, an agency must:

(2) (i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and

(ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.
48 C.F.R. § 15.404–1(g) (1999).

20. Plaintiff points out that, with respect to FDC(A), "the first year price ranges from 43% to 39% of the total price, depending on the region," but "[i]n contrast, the fifth year price is only from 3.8% to 5.7% of the total price, again depending on the region." Reformulating its mathematical calculations, plaintiff then gives the range in ratios from year one prices compared to year five prices: 11:1 to 7:1, depending on region. *See* Plf's Br. filed Sept. 6, 2000, at 22.

21. Plaintiff concludes that these prices mean that DISA will be making advance payments to intervenor in violation of the Anti–Deficiency Act, 31 U.S.C. § 3324 (1994). The GAO held that plaintiff made no showing that agency payments to intervenor in one year were to be applied to another year and rejected this argument in a footnote. *See CCL Service Corp.*, at p. 10, n. 22 (GAO July 28, 2000) (advisory op.) This court comes to the same conclusion.

tion of cost or price analysis techniques indicates that the price of one or more contract line items is significantly overstated or understated. FAR § 15.404–1(g)(1). Although prior FAR Part 15 provisions called for rejection of an unbalanced offer if it was so grossly unbalanced that its acceptance would be tantamount to allowing an "advance payment," FAR § 15.814(b)(2) (June 1997), the recent revisions to FAR Part 15 eliminated any reference to "advance payments," instead requiring a procuring agency to perform a risk analysis to determine whether award on the basis of an apparently unbalanced offer would result in paying unreasonably high prices or would otherwise present an unacceptable level of risk to the government.[22]

*CCL Service Corp.*, B–284110.6 at 7. DISA considered that intervenor's pricing scheme contained significantly higher prices in the beginning years. DISA inquired with intervenor regarding its price structure with DI–X017, DISA's inquiry into intervenor's pricing structure. *See supra* note 9. The GAO found that DISA considered intervenor's response, compared intervenor's prices with the independent government estimate and with plaintiff's prices by region and contract period, and performed additional price analyses to assess the "sensitivity" of the proposed prices to various alternative scenarios, ultimately concluding that intervenor's prices were reasonable. *CCL Service Corp.*, B–284110.6, at 7–8. Furthermore, the FAR states that an offer may, not must, be rejected if the agency determines that the unbalancing poses an unacceptable risk. FAR § 15.404–1(g)(3). The FAR gives the agency discretion to make that determination. The GAO held that DISA did not abuse that discretion. The Court of Federal Claims is "not bound by the views of the Comptroller General nor do they operate as a legal or

judicial determination of the rights of the parties." *Burroughs Corp.*, 223 Ct.Cl. at 63, 617 F.2d at 597. However, the court, after its own review, considers the GAO's analysis to be legally and factually sound. The regulation does not require DISA to do more than it did, and DISA performed a sufficient analysis.

Plaintiff marshals alleged inconsistencies among intervenor's proposals and answers to DISA's inquiries regarding all facets of the evaluation. If true, the inconsistencies would have affected the OEM support subfactor, which accounts for one sixth of the technical evaluation factor. An examination of the statements made by intervenor and how they were interpreted by DISA is necessary to determine if intervenor, in fact, made a material misrepresentation.

Plaintiff first claims that intervenor's proposals promised direct OEM maintenance for all five years of the contract. However, defendant points to several statements where intervenor specifically mentions possible use of TPMs, both in its proposals and in response to DISA's discussion questions.[23] Plaintiff further asserts that DISA viewed intervenor's proposals as being technically superior, in part because of the direct OEM maintenance. The report to which plaintiff cites for this proposition, the "Hardware Maintenance Consolidation Procurement SSA Award Decision Memorandum," discusses OEM support, not maintenance, and does not refer to intervenor's use of OEMs as maintenance providers. In addition, plaintiff offered an edited version of the "strengths" section from an evaluation worksheet written by the T/MET chair David Quirk in an effort to show that DISA believed intervenor was offering OEM maintenance. *See* Plf's Prop. Find. of Uncontr. Fact, filed Sept. 7, 2000, ¶ 63. The complete quotation appears below. The portions of the quotation in italics are

---

**22.** "The revised Part 15 of the FAR applies to solicitations, such as the one here, that were issued after January 1, 1998." *CCL Service Corp.*, B–284110.6, at 7.

**23.** In its response to DISA's inquiry into intervenor's pricing structure, DI–X017, intervenor stated: "The capability for upgrade correlates closely with manufacturer and *third-party maintainer*

behavior regarding product life, service life, service cost, and *third-party maintainer* availability," and additionally that price "reductions result from the liquidation of parts inventories by the manufacturer and the shift from manufacturer to *third-party maintainer* control of the service market for the product." (emphasis added). *See also* excerpts from intervenor's proposal *supra* note 8.

portions that plaintiff removed, and the bolded emphasis shown was that added by plaintiff.

> [JAN] FDC(A) will ensure that DISA mission-critical systems remain up and running because of the high quality of OEM support and the high percentage of OEMs supporting the Government equipment. *FDC(A) has worked with OEM and third-party support for over 30 years. OEM and maintenance service providers are highly experienced.* Six OEM's cover 60 + percent of the DISA equipment inventory on this RFP. *FDC(A) has received numerous awards for its performance on maintenance contracts.* The team validated that two vendors (IBM & STK) cover 47 + percent of DISA equipment on this RFP. [FEB] **Response to DI# 14 says Offeror will dispatch the OEM or its authorized service agent on first dispatch.** *[MAR] NSC letter submitted allowed NSC to be added to OEM Support. FDC(A) graded out Blue for OEM support. (Region One only).*

The italicized material reveals that the T/MET chair expressly recognized and approved intervenor's TPMs. Although plaintiff bolded the above sentence, that statement detracts from its argument. Dispatch of the OEM or the OEM's "authorized service agent" reads as yet another reference to a TPM, but, in this case, a TPM that is authorized by the OEM.[24]

Defendant disputes plaintiff's conclusion that intervenor received a "high rating" because of the OEM maintenance. Def's Stat. of Gen. Issues, filed Sept. 25, 2000, ¶ 67. Plaintiff cites various evaluation worksheets in the administrative record that are similar to the T/MET chair's quotation above.[25] Defendant terms plaintiff's argument a "subjective characterization" of the evaluation process, and indicates that plaintiff's rating for its technical proposal was not affected by its decision to use TPMs. *Id.* The OEM support evaluation for plaintiff does not mention that its choice to use TPMs was a weakness. However, that fact does not necessarily lead to the conclusion that OEM maintenance was not considered in intervenor's evaluation.

Plaintiff insists that intervenor did not mention replacing, rather than repairing, certain equipment until intervenor submitted the declaration of its president, Mr. Bander, which was executed on May 25, 2000, in response to plaintiff's protest filed with the GAO.[26] Plaintiff does not interpret intervenor's response to DI–X017, which stated in part, "service costs have been based upon mechanical replacement in some instances. . . ." as indicating replacement because the word "mechanical" is used instead of "equipment." This argument, like many others advanced by plaintiff, relies too heavily on semantics. Moreover, the RFP discussed hardware replacement in its Statement of Work, section C.7 "Maintenance Requirements": "Prior to acceptance by the Government, the repaired or replaced hardware item shall meet the acceptance test standards outlined in the OEM's specification." Because DISA anticipated that the proposed contract would involve equipment replacement, it can be assumed that its evaluators understood intervenor's answer to DI–X017 to mean just that.

The tug-of-war between plaintiff and defendant over the interpretation of statements made either by intervenor or DISA evaluators ranges over a multitude of documents evidencing a striking pattern. Plaintiff reads intervenor's dearth of explicit statements regarding equipment replacement and phase-in of TPMs, before the Bander Declaration, as a slight-of-hand. Defendant counters re-

---

24. DISA gave both plaintiff and intervenor credit for OEM support where an OEM approved TPM was offered. *See* discussion *supra* p. 117 & note 13.

25. For example, plaintiff quotes another worksheet completed by the T/MET chair where he writes, "FDC(A) gets the OEM in from the start (in Response phase), and the Government has the protection of maintenance credits if FDC(A) fails."

26. The Bander Declaration states in part:

> [Intervenor] proposed prices that allow it to decide, on a case-by-case basis, whether to incur the costs of replacing an old product susceptible to recurring maintenance problems with a new, more reliable product . . . . The replacement item would not only be new and more reliable, but it also would be under warranty for a year or more after installation. Bander Declr. ¶ 9.

**124**

peatedly that intervenor's statements were sufficiently unambiguous to convey to DISA that TPMs would be used, as well as OEMs. Plaintiff has seized upon almost every DISA mention of intervenor's OEM agreements during the evaluation process and aggrandizes these statements as the predicate for the award to intervenor. Plaintiff has not met its burden of proof for misrepresentation. The record before DISA as a whole demonstrates that DISA knew that TPMs would play a part of intervenor's five-year plan. Furthermore, intervenor's procurement award was based not on OEM support, but on the factors DISA's evaluation reports emphasized: the three-hour repair time, the maintenance credits, and the number and quality of OEM agreements intervenor had in place, whether they were to provide maintenance or support.

### CONCLUSION

Accordingly, based on the foregoing,

1. Defendant's and intervenor's motions for judgment on the administrative record are granted, and plaintiff's is denied.

2. The Clerk of the Court shall enter judgment for defendant and intervenor.

3. By October 20, 2000, the parties shall file requests for deletion of protected/privileged material before the court issues its opinion for publication.

**IT IS SO ORDERED.**