**COLORADO CONSTRUCTION CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 02–1294C.

United States Court of Federal Claims.

Sept. 16, 2003.

Gary E. Di Grazia, Elko, NV, for plaintiff.

Hillary A. Stern, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Hugo Teufel III, Associate Solicitor and Jim Weiner, Office of the Solicitor, Bureau of Indian Affairs, of counsel.

## ORDER

MILLER, Judge.

This case is before the court on cross-motions for judgment on the administrative record. Plaintiff was the lowest final bidder on a construction contract that had been set aside for an Indian Economic Enterprise. The United States Department of Interior, Bureau of Indian Affairs (the "BIA"), determined that plaintiff was not an eligible Indian Economic Enterprise and awarded the contract to the next lowest bidder. The issue to be decided is whether the BIA's decision was arbitrary and capricious.

## FACTS

The relevant facts derive from the Administrative Record. On February 8, 2002, the BIA Western Regional Office electronically synopsized a presolicitation notice for bridge replacement and related road work at the South Fork Indian Reservation, Elko County, Nevada. The notice advised that the project was "SET–ASIDE FOR 51% INDIAN OWNED AND CONTROLLED FIRMS UNDER THE 'BUY INDIAN ACT.' 25 U.S.C.§ 47." The BIA duly issued a solicitation for bids, number RBH00020006 on March 1, 2002 (the "solicitation"). The solicitation contained a "Notice of Indian Economic Set–Aside," which defined "Indian Economic Enterprise" as "(1) ... at least 51 percent owned by one or more Indian(s) or (an) Indian Tribe(s); (2) for non-tribal ownership, has one or more of its Indian owners involved in daily business management of the economic enterprise; and (3) has the majority of its earnings accrue to such Indian [person(s) ] if organized for profit." The solicitation further notified potential bidders that offers "received from non-Indian economic enterprises or non-eligible Indian economic enterprises shall be rejected."

On April 8, 2002, Colorado Construction Company ("plaintiff") submitted a bid in response to the solicitation. Along with the bid, plaintiff provided substantiation that its president, Michael W. Thomas, was a member of a federally recognized Indian tribe. Mr. Thomas, as majority owner of plaintiff, certified that plaintiff was an "eligible Indian economic enterprise."

The BIA received six bids by the due date, April 17, 2002. Because the lowest bidder refused to extend its acceptance period, plaintiff, which had been the second-lowest bidder, became the lowest bidder. To evaluate plaintiff's bid, on June 3, 2002, the BIA requested documentation regarding plaintiff's corporate formalities, construction capabilities, and experience. Plaintiff responded by providing the requested documents on June 14, 2002.

The BIA requested additional documentation from plaintiff on June 24, 2002, to verify that plaintiff "meets the requirements of an eligible Indian Economic Enterprise of the Buy Indian Act." Plaintiff responded to this request on June 26, 2002, by sending minutes of its stockholders' and directors' meetings and a stock certificate, all of which were dated March 20, 2002.

The documents provided to the BIA recited that plaintiff was incorporated in October 1993 by Michael Lattin and Pamela Lattin, neither of whom is a member of a federally-recognized Indian tribe. On March 20, 2002, Mr. Thomas was elected as one of two directors and president of plaintiff. Mr. Thomas owns 510 of plaintiff's 1,000 outstanding shares, and Ms. Lattin owns the balance of 490 shares. Ms. Lattin serves as the other director, as well as secretary and treasurer of plaintiff.

Ms. Lattin also serves as secretary of Canyon Construction Company ("Canyon"), of which Mr. Lattin is president. Plaintiff and Canyon share the same physical address and facsimile number. Mr. Thomas has been an employee of Canyon since 1998. Although he has worked in the construction industry for almost 20 years, Mr. Thomas's resume lists only one experience with bridge reconstruction. Plaintiff had a single asset on May 31, 2002—$500.00 in a bank account. As of June 14, 2002, plaintiff reported having no sales receipts for the preceding three years. Although plaintiff was formed eight and one-half years before submitting its bid, plaintiff represented that it "had not been awarded any projects to date."

According to plaintiff's June 26, 2002 letter to the BIA, Mr. Thomas "makes all construction decisions and controls [plaintiff]," while Ms. Lattin "serves as [plaintiff's] office manager which includes payroll, taxes, permits, contracts, subcontracts, hiring, interviews, billings, and accounts payable." Ms. Lattin signed correspondence on behalf of both Mr. Thomas and plaintiff.

Plaintiff was to finance the bid through a $100,000.00 line of credit from Great Basin Bank of Nevada and a $5,000,000.00 line of credit from Canyon. Also accompanying the bid was a surety agreement signed by Mr. Thomas; Angela Thomas; and Mr. and Ms. Lattin, both as individuals and on behalf of plaintiff and Canyon. In addition to providing financial backing, Canyon agreed to provide plaintiff with "personnel for technical consultation and advise [sic] as necessary."

BIA rejected plaintiff's bid on July 10, 2002, stating plaintiff "provid[ed] insufficient evidence that the control and daily management of the company lies with an Indian-owned enterprise." When the BIA accepted the bid of Laguna Construction Company, plaintiff responded by filing a bid protest with the General Accounting Office (the "GAO"). On August 13, 2002, the BIA, citing urgent and compelling circumstances, determined that performance of the contract should continue despite the bid protest from plaintiff. After evaluating the submissions of both plaintiff and the BIA, the GAO denied plaintiff's bid protest on September 6, 2002. Plaintiff seeks bid preparation costs and interest stemming from the rejected bid.

## DISCUSSION

### 1. *Jurisdiction and scope of review*

■ Jurisdiction in the Court of Federal Claims is prescribed by the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), which allows a protestor to challenge "the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." The court evaluates the procuring agency's conduct to determine whether the Government's conduct was arbitrary and capricious. *See* 28 U.S.C. § 1491(b)(4) ("In any action under

this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). To prevail under the arbitrary and capricious standard, a frustrated bidder is required to establish that the government officials involved in the procurement process lacked a rational and reasonable basis for their decision. *See Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996).

RCFC 56.1 motions for judgment on the administrative record are reviewed under the same standards as motions for summary judgment. *See Lion Raisins, Inc. v. United States*, 51 Fed.Cl. 238, 246 (2001). Although summary judgment and judgment on the administrative record are treated the same under Rule 56, they are of the same genus, but not the same species. Judgment on the administrative record has evolved as a convenient format for arguing in court a case based upon the record of an agency decision. *See Tech Sys., Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001). In deciding a motion for summary judgment, the central issue is whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment. *See CCL Serv. Corp. v. United States*, 48 Fed.Cl. 113, 119 (2000). When deciding a motion for judgment on the administrative record, the inquiry instead is whether, given all the disputed facts, plaintiff has met its burden of showing that an award is arbitrary, capricious, or prejudicially violates applicable procurement regulations. *Id.*

The BIA has "broad discretionary authority to implement the Buy Indian Act." *American Eagle Indus.*, 1994 WL 55867, at *2, 1994 U.S. Comp. Gen. LEXIS 130, at *4, 94–1 Comp. Gen. Proc. Dec. P128, at 3, B–255251 (Feb. 22, 1994). This discretion includes determining "the quantum of evidence necessary to establish compliance." *Cheyenne, Inc.*, 1995 WL 331076, at *3, 1995 U.S. Comp. Gen. LEXIS 370, at *7, 95–2 Comp. Gen. Proc. Dec. P117, at 4, B–260328 (June 2, 1995). This standard reposes a special degree of deference to the BIA's explanation of plaintiff's showing.

Expenses incurred in preparing bid proposals are normally a cost of business that is lost "when the effort to obtain the contract does not bear fruit." *Lincoln Servs., Ltd. v. United States,* 230 Ct.Cl. 416, 417, 678 F.2d 157, 158 (1982). However, a disappointed bidder may recover the cost of preparing a bid if it establishes that the agency's award decision as arbitrary and capricious. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 447 (Fed.Cir.1996).

The GAO considered and rejected plaintiff's protest. The BIA's conclusion regarding eligibility under the Buy Indian Act will be disturbed by the GAO "only where it is shown to be arbitrary, unreasonable, or in violation of law or regulation." Decisions by the GAO traditionally have been accorded a high degree of deference by the courts, particularly those involving bid protests. *See E.W. Bliss Co. v. United States,* 33 Fed.Cl. 123, 135 (1995), *aff'd,* 77 F.3d 445 (Fed.Cir. 1996). Although GAO decisions are not binding, they are considered "expert opinions," which the court should prudently consider. *See Thompson v. Cherokee Nation of Okla.,* 334 F.3d 1075, 1084 (Fed.Cir.2003). "[T]he court is to answer the question whether the agency's procurement decision or the GAO's decision on the protest was reasonable based on the record before the contracting officer or the GAO." *E.W. Bliss Co.,* 33 Fed.Cl. at 135.

Defendant argues that the BIA reasonably rejected plaintiff's bid because sufficient evidence was not provided that Mr. Thomas would be involved in the daily business management of plaintiff. The record shows that Canyon would have been responsible for the management of plaintiff. In addition, defendant argues that no showing was made that Mr. Thomas would have received the majority of earnings from the contract. Defendant does concede that Mr. Thomas is an Indian, as described by the Act, and that he is also the majority (51%) owner of plaintiff.

Defendant does not contest that plaintiff complied with the technical terms of the Buy Indian Act, but contends that the facts supplied by plaintiff cast doubt as to whether plaintiff was controlled by an Indian and that plaintiff failed to overcome that doubt. Defendant faults plaintiff's showing to the BIA that Canyon would not have been in actual control of plaintiff, given the financing of the venture and plaintiff's insufficient capital; that Mr. Thomas lacked experience with bridge reconstruction; and that Mr. Thomas would receive a majority of the profits from the project.

Plaintiff responds that BIA applied an improper standard and irrationally rejected plaintiff's bid. According to plaintiff, the Buy Indian Act requires that an Indian be "involved" in the daily business management—not that an Indian be the daily manager. Regarding control, plaintiff interprets the solicitation as only requiring an Indian to own at least 51%, a fact not disputed by defendant. As the majority shareholder, plaintiff argues, Mr. Thomas was, as a matter of law, in control of plaintiff in that he would be able to elect directors, change bylaws, issue stock, and control disbursement of earnings. Although plaintiff concedes that Mr. Thomas was not active in the daily management of plaintiff, plaintiff counters that no management was necessary because plaintiff had not yet been awarded the BIA contract and was not involved in any other projects.

### 2. *Merits of plaintiff's claim*

For a bidder to be eligible as an Indian Economic Enterprise under the solicitation, it must meet three criteria: (1) At least 51% of the entity must be owned by an Indian; (2) an Indian owner must be involved in the daily business management; and (3) the majority of earnings must accrue to Indian persons. No dispute exists that plaintiff satisfies the first criterion; Mr. Thomas is a documented Shoshone–Paiute Indian and owner of 51% of plaintiff. The parties disagree as to the BIA's response to plaintiff's showings under the second and third criteria.

#### 1) *Whether an Indian was involved in business management*

In order to qualify as an Indian Economic Enterprise, the Indian owner must be involved in the daily management of the entity. Plaintiff has a single Indian owner, Mr. Thomas, who must be involved in the daily business management in order for plaintiff to

be a qualified bidder. In evaluating the involvement of an Indian owner, the BIA also analyzes whether true Indian control over the entity has been shown.

■ The BIA is empowered to look beyond mere technical compliance with the Buy Indian Act and evaluate whether a reasonable basis exists to doubt Indian management of an enterprise. *American Eagle Indus.*, 1994 WL 55867, at *4, 1994 U.S. Comp. Gen LEXIS 130, at *11. In *American Eagle Industries,* the BIA agreed that an Indian joint venture technically complied with the requirements of the Buy Indian Act (Indian ownership, apparent Indian management, and majority of profits accruing to an Indian). Despite technical compliance, the BIA rejected the bid based on three facts: Non-Indian ventures were responsible for the entity's previous projects, the Indian venturer previously had not performed work similar to the present project, and the Indian venturer lacked the financial ability to fund its share of the project. *Id.,* 1994 WL 55867, at *4, 1994 U.S. Comp. Gen LEXIS 130, at *13.

■ The bidder in *American Eagle* was a joint venture between Indian and non-Indian entities. Although plaintiff is constituted as a single entity, the factors that BIA considered significant in *American Eagle* are present. Plaintiff had no previous construction experience, less compelling qualifications than the bidder in *American Eagle.* Any projects credited towards plaintiff's (and Mr. Thomas's) specific experience were performed by Canyon. Mr. Thomas listed only one previous experience with bridge reconstruction, which was a project performed by Canyon. Plaintiff, moreover, was not in a position to finance the project independently. Plaintiff's net assets were $500.00, with almost all financing for the project ($5,000,-000.00) coming from Canyon. Given plaintiff's non-existent experience, Mr. Thomas's limited experience, and plaintiff's lack of capital, it was reasonable for the BIA to doubt that plaintiff would be able to complete the project on its own. Canyon, a non-Indian

entity, was to constitute the experience and financing and provided the sole assurance that the project could be completed.

In *Calvin Corp.,* 1992 WL 18514, 1992 U.S. Comp. Gen. LEXIS 101, 92–1 Comp. Gen. Proc. Dec. P98, B–245768 (Jan. 22, 1992), the GAO denied the bidder's protest where the Indian president was not an active manager. The bidder owned no construction equipment; the non-Indian entity provided the operating capital; the equipment would be acquired or leased from non-Indian concerns; non-Indians controlled the entity's banking, loans, and letters of credit; and non-Indians performed bookkeeping and accounting services. *Id.,* 1992 WL 18514, at *2, 1992 U.S. Comp. Gen. LEXIS 101, at *6.

Plaintiff does not own any construction equipment and would be required to lease any equipment from non-Indian entities. Plaintiff relies chiefly on Canyon, a non-Indian entity, for its financing. Plaintiff's indemnity agreement was signed by Mr. and Ms. Lattin and Mr. and Mrs. Thomas, of whom only Mr. Thomas is a qualified Indian. Ms. Lattin, as secretary, controlled plaintiff's bank accounts, handled correspondence, and provided bookkeeping and accounting services. Plaintiff had existed for over eight years at the time of the bid, during which time Ms. and Mr. Lattin were the sole officers and directors. Only one month before submitting plaintiff's bid did Mr. Thomas become president. But even after the ascension of Mr. Thomas, Ms. Lattin continued to run the daily operations of the plaintiff.[1]

The GAO sustained a bid protest from an Indian Economic Enterprise in *Young & Joe Construction,* 1997 WL 14240, 1997 U.S. Comp. Gen. LEXIS 20, 97–1 Comp. Gen. Proc. Dec. P26, B–275043 (Jan. 16, 1997). Young and Joe Construction ("Young") was a joint venture between an Indian and non-Indian entity. Young qualified for its own line of credit from a bank and for its own bond. Young had named an Indian as project manager, although the BIA contracting officer deemed the manager unqualified.

---

1. Plaintiff counters that prior to an award of a contract no daily management necessitated Mr. Thomas' involvement. Nonetheless, the record before the BIA reflects that for eight and one-half years plaintiff was idle; even after Mr. Thomas became president, plaintiff still was not involved in any other projects; and Mr. Thomas remained an employee of Canyon.

The GAO ruled otherwise, as the manager had a range of construction experience, including experience on the type of project being solicited. In addition, the Indian manager was the sole holder of a state engineering license, which was necessary for the project. The BIA officer cited Young's lack of completed projects. However, although Young had been in business only for one year, it was currently engaged in other projects. The GAO also found that Young's lack of construction equipment was not dispositive, as Young planned to obtain equipment from a separate Indian-owned entity.

In contrast, plaintiff is not self-financing the bid; rather, it is relying on Canyon for almost all of its capital. Plaintiff had existed significantly longer than Young, but had not attempted any other projects. Just as Young, plaintiff did not own its equipment; however, unlike Young, plaintiff did not plan to obtain equipment from an Indian-owned entity. As plaintiff's proposed project manager, Mr. Thomas has extensive construction experience, but limited experience in road and bridge work. He does not hold a Nevada State contractor's license (although plaintiff represents that one would not be necessary for this particular project).

Plaintiff's reliance on Canyon for its financing, the equal authority of Ms. Lattin on the Board of Directors,[2] and Ms. Lattin's extensive involvement in the daily operation of plaintiff generate reasonable doubt of Mr. Thomas's role in the management of plaintiff. Although Mr. Thomas had construction experience, he had limited bridge and road-work experience, further justifying BIA's reasonable questions about his ability to manage and complete the project. It was no more reassuring to the BIA that plaintiff as an entity had even less experience than its project manager and extremely limited resources.

Although, viewed individually, these factors may not have justified rejecting plaintiff's bid, together they provide a reasonable basis for the BIA's action, and the BIA is permitted to consider their cumulative effect. On this record the BIA reasonably determined plaintiff to be ineligible as an Indian Economic Entity for lack of Indian control or involvement in business management. Because the record provides a reasonable basis for its action, the BIA's rejection was neither arbitrary nor capricious.

### 2) *Whether 51% of profits would accrue to an Indian*

For the sake of a complete record, the court will address the third criterion of an Indian Economic Enterprise. Fifty-one percent of the earnings from the project must accrue to the Indian owner. Plaintiff is a Nevada corporation, with two directors, Mr. Thomas and Ms. Lattin. Plaintiff's bylaws allow the directors to declare dividends and disburse to the capital stock whenever a net profit is realized. *See* Nev.Rev.Stat. § 78.288 (2002).

In the event that profits were generated and distributed, Mr. Thomas, as 51% shareholder, would receive 51% of the declared earnings disbursed to capital stock. This distribution would occur as a matter of law, consistent with plaintiff's articles of incorporation and bylaws and the governing statutes. Any deviation from this prescription would require the approval of Mr. Thomas as director and majority shareholder. Plaintiff thus demonstrated to the BIA that a majority of profits from the project would accrue to an Indian. The BIA's conclusory finding to the contrary was arbitrary and capricious. However, because plaintiff failed to show that the BIA decision was arbitrary or capricious with respect to management, plaintiff has failed to sustain its burden.

### CONCLUSION

Accordingly, based on the foregoing,

Defendant's motion for judgment upon the administrative record is granted, and plaintiff's cross-motion is denied, and the Clerk of the Court shall enter judgment for defendant.

---

**2.** Plaintiff argues that Mr. Thomas exercises control as a member of the Board of Directors. However, there are two directors, Mr. Thomas and Ms. Lattin, each with an equal vote necessary for board action. While this arrangement gives Mr. Thomas the ability to veto actions taken by Ms. Lattin, it does not give Mr. Thomas control over plaintiff.

**IT IS SO ORDERED.**

No costs.