**PITNEY BOWES GOVERNMENT SOLUTIONS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Stanley Associates, Inc., Intervening Defendant.**

No. 10–257C.

United States Court of Federal Claims.

Filed Under Seal: Aug. 11, 2010.

Reissued: Aug. 19, 2010.

William M. Weisberg, Bryan Cave LLP, Washington, D.C., for plaintiff. With him on the briefs and at the hearing were Joyce L. Tong and William E. Olsen, Bryan Cave LLP, Washington, D.C.

David A. Levitt, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Don Kinner, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Barry C. Hansen and Gordon R. Jimson, Justice Management Division, Office of General Counsel, United States Department of Justice, Washington, D.C.

Leigh T. Hansson, Reed Smith LLP, Washington, D.C., for intervening defendant. With her on the briefs and at the hearing were Gregory S. Jacobs, Daniel Z. Herbst, and Joelle E.K. Laszlo, Reed Smith LLP, Washington, D.C.

## *OPINION AND ORDER* [1]

LETTOW, Judge.

This post-award bid protest concerns a contract to perform mail management, warehousing, and related support services for the Department of Justice ("the Department" or "DOJ"). The contract was awarded to Stanley Associates, Inc. ("Stanley") on April 1, 2010, with BrightKey, Inc. ("BrightKey") as a subcontractor. The protestor, Pitney Bowes Government Solutions, Inc. ("Pitney Bowes"), was the incumbent contractor and also sought the award of the new contract. On April 23, 2010, Pitney Bowes filed its protest in this court. Stanley promptly moved to intervene, and its motion for intervention was granted on April 27, 2010.

An expedited schedule was arranged for submission of the administrative record for the protested procurement and for filing by the parties of cross-motions and briefs for judgment on that record. The administrative record was filed on April 29, 2010, and Pitney Bowes moved for judgment on that record. The government and Stanley opposed Pitney Bowes' motion for judgment and filed cross-motions.[2] The parties have since completed briefing the competing motions for judgment on the administrative record, and a hearing was held on July 9, 2010. The case is accordingly ready for disposition.

## FACTS[3]

To fulfill its needs for mail management, warehousing, and related support services, the Department distributed a Request for Information on July 17, 2009, *see* AR 1-000001 (Request for Information (July 17, 2009)); [4] and then issued a Request for Pro-

---

1. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before August 18, 2010. Redactions were proposed, and those redactions were accepted and approved by the court in principle, although not precisely to the degree proposed. The resulting redactions are shown by asterisks enclosed by brackets, *e.g.*, "[* * *]."

2. In addition, a schedule was developed for briefing motions by Pitney Bowes to supplement the administrative record, which briefing overlapped the submission and briefing of the cross-motions for judgment. Hr'g Tr. 7:8–11:22, 13:20–18:3, 22:13–24:1 (Apr. 27, 2010). On May 28, 2010, the court issued an opinion and order granting in part Pitney Bowes' motions to supplement the administrative record, allowing depositions to be taken of the contracting officer and members of the Technical Evaluation Panel ("TEP") that had considered the competitors' offers. The court acted on the grounds (1) that Pitney Bowes had put forward a sufficiently strong evidentiary basis for an allegation of personal bias in favor of Stanley in the procurement process to support such discovery, and (2) that the contracting officer had caused the individual evaluation sheets of the TEP members to be destroyed, contrary to 48 C.F.R. ("FAR") Subpart 4.8, and consequently depositions of the TEP members were needed to reconstitute their individual evaluation sheets. *Pitney Bowes Gov't Solutions, Inc. v. United States*, 93 Fed.Cl. 327 (2010).

Shortly thereafter, the government learned that its information-technology staff might be able to obtain the individual panel members' scoring sheets from archived computer backup tapes. The individual panel members' scoring sheets were successfully retrieved from computer backup tapes and forwarded to Pitney Bowes and Stanley just prior to the depositions of the contracting officer and the members of the TEP. The government thereafter was granted leave to supplement the administrative record with the recovered scoring sheets.

3. The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions related to prejudice and equitable relief. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed.Cir.2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); *Santiago v. United States*, 75 Fed.Cl. 649, 653 (2007) ("In accord with RCFC 52. 1, the court 'is required to make factual findings ... from the [administrative] record as if it were conducting a trial on the record.'" (quoting *Acevedo v. United States*, 216 Fed.Appx. 977, 979 (Fed.Cir.2007))).

Other findings of fact and mixed findings of fact and conclusions of law are stated in the analysis which follows.

4. "AR ——" refers to the administrative record filed with this court in accordance with RCFC 52.1(a). The administrative record has been subdivided into tabs. The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page number of the administrative record, *e.g.*, "AR 1-000001." The pages of the administrative record are paginated sequentially

posal ("Solicitation") on November 24, 2009, AR 8–000237 to 238 (Solicitation (Nov. 24, 2009)); AR 18–001060 (Procurement Integrity and Non–Disclosure Brief for Source Selection Participants (Dec. 28, 2009)). The Request for Proposal described the contract as consisting of a "Base Period" through September 30, 2010, followed by four one-year "Option Periods" and up to two additional one-year "Award Term" option periods awarded based on overall performance. AR 8–000242 (Request for Proposal, § B.1 (B)). Five proposals were received and evaluated by the TEP, including those offered by Pitney Bowes and Stanley. AR 20–001077 (Technical Evaluation Panel Report (Feb. 16, 2010)) ("TEP Report"). The TEP consisted of three voting members, two of whom—Evie Sassok, who also served as chairperson, and Joseph Gerstel—were the two Contracting Officer's Technical Representatives on the existing contract. AR 5–000186 to 87 (Evaluation Plan (Oct. 1, 2009)).[5] The third TEP member, Amy Archiopoli, worked in the Department's Justice Management Division on the Facilities and Administrative Services Staff, which was responsible for the administration of the contract and procurement at issue. *Id.*

Prior to the commencement of the technical evaluation, the contracting officer, Miguel Shivers, convened a "kickoff meeting" with the TEP members, during which the panelists were provided with an overview of the procurement process and "Conflict of Interest Certification" forms to sign stating they did not have a conflict of interest preventing them from participating in the procurement. Affidavit of Miguel Shivers (May 10, 2010) ("Shivers Aff.") ¶ 8.[6] The panel members were also given individual technical-evaluation-factor score sheets for their use in rating the competing offers. AR 5–000200 (Evaluation Plan). Use of the score sheets in evaluating the proposals was discretionary. Shivers Aff. ¶ 9. The TEP was ultimately responsible for drafting a consensus "Technical Evaluation Report" for submission to the contracting officer to include "signed concurrences by the TEP's voting members," setting out a ranking of the technical proposals based on numerical scores derived from weighted factors, narrative assessments of strengths, weaknesses, deficiencies, and risks, and, if applicable, a minority report. AR 5–000192 to 94 (Evaluation Plan).[7] It was also the responsibility of the TEP to submit a "Best Value Recommendation" to the contracting officer identifying the offer the TEP found to represent the "best value" to the government. AR 5–000194 to 95 (Evaluation Plan).

The TEP began the evaluation process in early January 2010, first evaluating the proposals individually, then meeting as a group to discuss the proposals and draft a consensus report. Shivers Aff. ¶ 11. On February 16, 2010, the TEP submitted a final version of its Technical Evaluation Report to the contracting officer signed by all panelists.

without regard to the tabs. Citations to the recovered scoring sheets of the individual panel members will be to "SAR at ——."

References to the hearing on the cross-motions for judgment on the record conducted on July 9, 2010, will be to "Hr'g Tr. ——" without further annotation as to the date of the hearing.

5. Prior to joining DOJ in 2002, Ms. Sassok worked for DDD Company, ·which during that time was owned by Donald Dilks. Def.'s Opp'n to Pl.'s First and Second Mots. to Supplement the Administrative Record Ex. 1 (Aff. of Evie Sassok) ("Sassok Aff.") ¶¶ 4–6. The parent company of Pitney Bowes, Pitney Bowes, Inc., acquired DDD in the fall of 2003, and Mr. Dilks is currently an executive of BrightKey, which is engaged in the same type of contracting activity as Pitney Bowes. Pl.'s Mem. in Support of Mot. to Supplement the Administrative Record Ex. 1

(Aff. of William Michael Rooney, Director of Area Operations, Pitney Bowes) ¶¶ 2–3, 6.

6. The Shivers Affidavit and the affidavits of Ms. Sassok have been incorporated in the administrative record because those affidavits relate to the issue of alleged bias, and those affiants were also deposed both on the issues of bias and as part of the effort to reconstitute evaluation sheets of individual TEP members. The Shivers Affidavit was initially submitted as Exhibit 2 to the Government's Opposition to Plaintiff's First and Second Motions to Supplement the Administrative Record. The First Sassok Affidavit was attached as Exhibit 1 to that same Government's Opposition.

7. The contracting officer was responsible for evaluating the business and pricing proposals and drafting the Price Evaluation Report.

AR 20–001072 to 74 (TEP Report).[8] Stanley's technical proposal received the highest score, receiving [* * *] out of a possible [* * *] points. AR 20–001080 (TEP Report). Pitney Bowes received the third highest technical score, receiving [* * *] points. *Id.* At this time, the contracting officer provided the TEP with his Price Evaluation Report to enable the panel to make its Best Value Recommendation, which it did on February 22, 2010, recommending Stanley for the award. AR 23–001201 to 04 (Best Value Recommendation (Feb. 22, 2010)). Stanley's proposed price of $[* * *] was the lowest of the proposals deemed "technically acceptable" to the Department. AR 22–001187 (Price Evaluation Report (Jan. 12, 2010)); AR 23–001203 (Best Value Recommendation (Feb. 22, 2010)); Shivers Aff. ¶ 17. Pitney Bowes proposed a price of $[* * *], which was the second lowest. AR 22–001187 (Price Evaluation Report); AR 23–001203 (Best Value Recommendation).

Contracting Officer Shivers issued the Award Determination on February 25, 2010, stating that "the offer submitted by Stanley . . . provides the best overall value with the best technical solution at a reasonable price." AR 24–001207 (Award Determination (Feb. 25, 2010)). The contracting officer credited Stanley with "a sound technical approach and an excellent understanding of the requirement." *Id.* He described Pitney Bowes' proposal as "technically acceptable, . . . [but] ha[ving] major weaknesses in a number of areas," *id.*, elaborating that "[e]ven if Pitney were afforded the opportunity to correct its technical weaknesses and to reduce its price, it is highly unlikely that it could overcome the substantial technical difference between its proposal and the two technically-higher Offerors [and] . . . bridge the gap in price, which is over $[* * *]." AR 24–001208 (Award Determination (Feb. 25, 2010)).

## STANDARDS FOR DECISION

▮ When addressing a bid protest, the court adheres to the standards specified in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, this court may set aside an agency's award of a contract if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential" to the agency's procurement decision, *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir.2000), and the court accords the agency's decision a " 'presumption of regularity.' " *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1085 (Fed.Cir.2001) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated in part by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (abrogating the portion of *Overton Park* that recognized the APA as an independent grant of subject matter jurisdiction)).

▮ The court's review is based upon the administrative record of the procurement. *See* RCFC 52.1(a); *Bannum, Inc. v. United States,* 404 F.3d at 1355–57. If the agency's action "evinc[es] rational reasoning and consideration of relevant factors," the court will sustain the action. *Advanced Data Concepts,* 216 F.3d at 1058. The agency's decision will be upheld even if the court might have applied the procurement regulations in a different fashion had the court been in the agency's position. *See Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989); *Lumetra v. United States,* 84 Fed.Cl. 542, 549 (2008) ("[T]he court 'will not second guess the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement.' " (quoting *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir. 1996))). However, where the agency " 'entirely failed to consider an important aspect of the problem, offered an explanation for its

---

8. It was after this submission that the contracting officer averred that he "destroyed all . . . working, draft, and obsolete files relative to the procurement" and "subsequently directed the TEP members to destroy any working, draft and obsolete documents and files that they had used in evaluating the proposals." Shivers Aff. ¶ 14.

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' " then its decision will be set aside. *Keeton Corrs., Inc. v. United States,* 59 Fed.Cl. 753, 755 (2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). To prevail, the protesting party must establish that "the procurement official's decision lacked a rational basis" or that "the procurement procedure involved a violation of regulation or procedure." *Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir. 2009) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001)); *accord Lumetra,* 84 Fed.Cl. at 549.

## ANALYSIS

Pitney Bowes' arguments supporting its motion for judgment on the administrative record are clustered into three groups. First, Pitney Bowes argues that the Department's contracting officer acted arbitrarily and capriciously and intentionally spoliated evidence by ordering destruction of the individual TEP members' scoring sheets, for which action Pitney Bowes avers evidentiary sanctions should be imposed regardless of the government's recovery of the scoring sheets from backup computer tapes. Second Mem. in Support of Pl.'s Mot. for Judgment on the Administrative Record at 10, 14 ("Pl.'s Second Mot. for Judgment") ("Once [s]poliated, [d]ocuments [c]annot [b]e [p]roduced to '[u]nspoliate' [s]uch [d]ocumentation."). Second, Pitney Bowes alleges the existence of personal bias on the part of Ms. Sassok in favor of Stanley and BrightKey. *Id.* at 16–17. Third, Pitney Bowes faults the technical evaluation, claiming (1) use by the TEP of "undisclosed evaluation criteria," (2) improper scoring of the offerors' proposals regarding portions of the contract concerning backup equipment, staffing, and the indefinite delivery, indefinite quantity ("IDIQ") requirement, and (3) flawed consideration of past performance reports. Pl.'s Reply and Resp. in Opp'n to Def.'s and Intervenor's Opp'ns and Cross–Mots. for Judgment on the Administrative Record at 14–20, 23–25 ("Pl.'s Reply and Resp.").

The government and Stanley have filed cross-motions for judgment on the administrative record, contending that "each of [Pitney Bowes'] allegations and contentions are meritless, both legally and factually." Def.'s Opp'n to Pl.'s Mot. for Judgment Upon the Administrative Record and Cross–Mot. for Judgment Upon the Administrative Record at 12 ("Def.'s Cross–Mot."); Intervenor Stanley Assocs., Inc.'s Opp'n to Pl.'s Mot. for Judgment Upon the Administrative Record, and Mot. for Judgment Upon the Administrative Record ("Stanley's Mot.").

### A. Spoliation

" 'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " *United Med. Supply Co. v. United States,* 77 Fed.Cl. 257, 263 (2007) (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999)). A federal district court in New York recently described the state of the law in this area by stating that, "[b]y now, it should be abundantly clear that the duty to preserve means what it says and that a failure to preserve records—paper or electronic—and to search in the right places for those records, will inevitably result in the spoliation of evidence." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 685 F.Supp.2d 456, 462 (S.D.N.Y.2010). A court may impose sanctions for spoliation, with the traditional and most typical remedy for spoliation being the drawing of an "adverse inference" that the destroyed evidence would have been favorable to the opposing side. *See Rimkus Consulting Group, Inc. v. Cammarata,* 688 F.Supp.2d 598, 615–17 (S.D.Tex. 2010) (holding that an adverse-inference jury instruction was an appropriate sanction for spoliation of evidence); *United Med. Supply,* 77 Fed.Cl. at 263.

In its earlier opinion and order, the court noted that Contracting Officer Shivers' destruction of the rating sheets of the individual members of the TEP "raises issues of spoliation of evidence." *Pitney Bowes,* 93 Fed.Cl. at 336. The court noted a division of

authority on the issue of whether a showing of "bad faith," which had not been alleged in this protest, is required for the court to impose sanctions. *Id.* (citing *Jandreau v. Nicholson*, 492 F.3d 1372, 1376 & n. 3 (Fed. Cir.2007) (raising, but not deciding, the question of whether negligent, as contrasted to bad faith, destruction of documents can give rise to an adverse inference, noting a conflict amongst the circuits); *United Med. Supply*, 77 Fed.Cl. at 264–71 (discussing the divergence in precedents)); *see also Rimkus Consulting*, 688 F.Supp.2d at 614 (noting that "in [the Fifth C]ircuit, the severe sanctions of granting default judgment, striking pleadings, or giving an adverse-inference instruction may not be imposed unless there is evidence of 'bad faith' ").

Shortly after the court's prior order was issued, however, the scoring sheets of the individual panel members were recovered from computer backup tapes, produced by the government, and made part of the record in this case. Nonetheless, Pitney Bowes argues that the government should be sanctioned for the contracting officer's order to destroy those scoring sheets. Pl.'s Second Mot. for Judgment at 8–15. The crux of Pitney Bowes' argument is that once the contracting officer ordered the TEP members to destroy their individual scoring sheets, spoliation occurred regardless of whether that directive was followed to its desired end. *See id.* at 10–12; *see also* Hr'g Tr. 25:3–8 ("If [the contracting officer] had attempted to burn the documents and was only able to burn half of them—anybody who has ever tried to burn newspaper knows it doesn't always burn completely[—]I would proffer that sanctions for spoliation would be appropriate even if he did a bad job of carrying out the spoliation.").[9]

Pitney Bowes also attacks the validity of the scoring sheets retrieved from the backup

tapes averring that it has "access[ed] the metadata attached to documents," which were forwarded to Pitney Bowes in electronic form, and has concluded that "these were not the same documents the [contracting officer] destroyed" because Ms. Sassok was the author of each of the documents and she was the last individual who saved the documents. Pl.'s Second Mot. for Judgment at 10–11.[10] Pitney Bowes claims that only the scoring sheets the contracting officer saved to his computer would be "true" and "accurate," and the documents which have been made part of the administrative record are "but a reproduction" of the actual scoring sheets, with the veracity of the "reproduction" being at issue. *Id.* at 11. As a remedy, Pitney Bowes asks the court to impose sanctions, or, in the alternative, to draw a negative inference from the "missing" documents in Pitney Bowes' favor. *Id.* at 12–15. Specifically, Pitney Bowes asks the court to infer that had Contracting Officer Shivers "not ... destroyed [the] score sheets, those documents would have indicated that Ms. Sassok changed Gerstell and Archiopoli's ratings and reviews of [Pitney Bowes]' proposal." *Id.* at 16.

The government denies that spoliation has occurred at all, asserting that "electronic records saved to backup tapes are not subject to spoliation charges even though they are deleted from personal computer files if such backup tapes have been retained and can be provided in discovery." Def.'s Cross–Mot. at 39 (citing *Forest Labs., Inc. v. Caraco Pharm. Labs.*, 2009 WL 998402, at *3–*4 & n. 3 (E.D.Mich.) (finding no spoliation where e-mail messages deleted from personal computers were preserved on backup tapes, but finding potential spoliation if earlier emails were overwritten after the trigger date for the preservation obligation); *Renda Marine*,

9. As it happened, one member of the TEP, Amy Archiopoli, did not follow the contracting officer's directive, and retained a copy of her individual scoring sheets. *See* Consent Second Mot. to Supplement the Administrative Record at 3. The government became aware of this fact during a session on June 3, 2010, to prepare Ms. Archiopoli for her deposition and promptly forwarded Ms. Archiopoli's materials to Pitney Bowes and Stanley. *Id.*

10. Microsoft Word files can contain metadata or "data about data" which may indicate "the creation date, the edit date, and the author ..., as well as other descriptive or identifying information" about a particular document. Pl.'s Second Mot. for Judgment at 11; *see also id.* (citing *Black's Law Dictionary* 1080 (9th ed.2009), which defines "metadata" as "[s]econdary data that organize, manage, and facilitate the use and understanding of primary data").

*Inc. v. United States*, 58 Fed.Cl. 57, 62 (2003) (requiring that e-mail messages deleted from personal computers but retained on backup tapes be provided in discovery to the opposing party)). Essentially, the "documents allegedly spoliated in fact were preserved and produced." Stanley's Mot. at 44 (citing *Hardwick Bros. Co., II v. United States*, 36 Fed.Cl. 347, 417–18 (1996) (deciding not to award spoliation sanctions or draw any adverse inferences where government produced documents, albeit after some delay)).

Respecting the so-called "veracity" of the documents retrieved from the backup tapes, the government asserts that "the documents [Pitney Bowes] received, and from which it extracted the metadata it now claims demonstrate Ms. Sassok's purported authorship of the TEP members' individual rating sheets, are the very documents that were in the [contracting officer]'s file and which the [contracting officer] later deleted." Def.'s Cross–Mot. at 40–41. According to the government, Ms. Sassok received the evaluations of the other members of the TEP as e-mail attachments, then "opened, renamed and saved the documents in her hard-drive to assist her in drafting the [TEP's] consensus [report] and then attached the documents to the e[-]mail she sent to the [contracting officer]." *Id.* at 41. The government accordingly argues that the metadata indicating Ms. Sassok "saved" the evaluations to her computer's hard-drive with new names, does not show, as Pitney Bowes would have the court infer, that Ms. Sassok altered or otherwise "defaced" the documents before using them and forwarding them to Mr. Shivers.

■ As addressed in the court's prior order, it was error on the part of the contracting officer to order the destruction of the scoring sheets. *See Pitney Bowes*, 93 Fed.Cl. at 336. However, the individual TEP members' evaluations of the proposals of Pitney Bowes and Stanley have since been produced and made part of the record. Essentially, there is no longer a question of spoliation because the documents were never in fact destroyed. Further, the court finds

Pitney Bowes' challenge to the veracity of the retrieved documents based on an analysis of the metadata to be without merit. Pitney Bowes has made no showing that Ms. Sassok modified the documents other than to save them under another name to her computer's hard-drive. Pitney Bowes makes much of the fact that Ms. Sassok forwarded the scoring sheets to the contracting officer, and the government did not also produce scoring sheets retrieved from the contracting officer's computer. However, the fundamental issue concerns the existence of the individual TEP members' scoring sheets, not the continued presence of those sheets on the contracting officer's computer. Pitney Bowes' spoliation claim consequently is unavailing, the TEP members' scoring sheets recovered from backup tapes are accepted as a valid part of the administrative record of the procurement at issue, and there is no basis to draw any adverse inference against the government respecting those scoring sheets.

### B. *Personal Bias*

Pitney Bowes contends that the Department failed properly to address an actual or perceived personal bias on the part of Ms. Sassok in favor of Stanley and BrightKey in the procurement process. Pl.'s Second Mot. for Judgment at 15. Pitney Bowes bases its bias claim primarily on the personal ties among Ms. Sassok, Mr. Dilks, and four other persons affiliated with either Stanley or BrightKey. *Id.* at 16.

The contracting officer had been informed by Ms. Sassok of her prior work with persons involved with Stanley or BrightKey and had determined that no bias existed. Shivers Aff. ¶ 21; Supplemental Affidavit of Evie Sassok (June 18, 2010) ("Sassok Supp. Aff.") ¶ 8.[11] The government supports the contracting officer's determination, asserting that there is no factual support for Pitney Bowes' claim that a "friendly working relationship" that had existed some years before the challenged procurement carried over into a personal bias in the procurement. Def.'s Cross–

---

11. The Sassok Supplemental Affidavit was filed with the court as Exhibit 1 to Defendant's Cross–Motion. For the reasons stated previously, *see*

*supra*, at 4 n. 6, it has been incorporated into the administrative record.

Mot. at 34 (citing Sassok Supp. Aff. ¶¶ 12–15).

■ To prevail on the merits of its bias claim, Pitney Bowes must make a heavy evidentiary showing. The Federal Circuit has said that the "clear and convincing standard of proof" is applicable. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1338 (Fed.Cir.2004); *see also Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed.Cir.2002). "In other words, . . . a protester must establish clear and convincing evidence of bad faith or bias to prevail on the merits." *L–3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed.Cl. 347, 355 (2010); *see also International Res. Recovery, Inc. v. United States*, 61 Fed.Cl. 38, 43 (2004). Earlier, Pitney Bowes met its lesser burden of supplying "sufficiently well grounded" allegations to justify the court's prior order allowing limited discovery related to its bias claim, *see Pitney Bowes*, 93 Fed. Cl. at 336, but on the merits, it must go further and adduce clear and convincing evidence of bias.

Pitney Bowes emphasizes that it can prevail on a sufficient showing of an appearance of impropriety in the procurement process. Several Federal Circuit precedents are instructive on this point. In *Galen*, the Federal Circuit stated that an appearance of bias can be said to exist where the plaintiff demonstrates that the government official accused of being biased had "some stake in the outcome of the government action influenced by that individual" or where there is the potential for a "symbiotic relationship" between the awardee and the government official. 369 F.3d at 1336. The court in *Galen* ultimately held that the fact that two of the evaluators of the competing proposals were listed as past performance references for the awardee was insufficient to establish an appearance of bias because there was no evidence of a "symbiotic relationship" such as a financial stake in the outcome of the procurement. *Id.* at 1335–37.

The earlier decision in *CACI, Inc.-Federal v. United States*, 719 F.2d 1567 (Fed.Cir. 1983) ("*CACI*"), also bears on the issue Pitney Bowes raises. Indeed, the facts of *CACI* share some similarity with the facts of this protest. In *CACI*, four of the five members of the Technical Evaluation Committee had some prior social or professional relationship with the vice president of the awardee. 719 F.2d at 1570. The Claims Court enjoined the award on the ground that those relationships created a sufficient opportunity for and appearance of impropriety that the participation of the affected members of the Technical Evaluation Committee was arbitrary, capricious, and an abuse of discretion. *Id.* at 1581–82. The Federal Circuit reversed, finding that a review of the record revealed that the Claims Court "ascribed evil motives to [the] four members of the Technical Evaluation Committee in their handling of bids" without "hard facts" supportive of any actual or potential wrongdoing. *See id.* at 1582. Further, that two of the members of the Technical Evaluation Committee had engaged in "discussions" with the vice president about the possibility of future employment prior to the issuance of the proposal for bids was not enough to bar those individuals from later participating in the procurement, a ban which could "cause serious problems for the effective functioning of the government." *Id.* at 1578; *cf. NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 376 (Fed.Cir. 1986) (holding that because of the potential for the appearance of bias, it was reasonable for the Navy to disqualify a bidder which had hired the former Contracting Officer's Technical Representative (who had been involved in preparing the solicitation and in the evaluation of earlier proposals regarding the same procurement), which bidder thereafter subsequently significantly lowered its bid price in a reopened round of offers for the procurement).

■ In the instant case, the administrative record does not reveal the kind of "clear and convincing evidence" necessary to support Pitney Bowes' bias claim. *Galen*, 369 F.3d at 1330. Rather, the record supports Ms. Sassok's assertions that, although employed by DDD from 1998 to 2002, she was never "personal friends" with Mr. Dilks or any former DDD colleagues now affiliated with Stanley or BrightKey. *See* Sassok Supp. Aff. ¶¶ 2–15. While at DDD, Ms. Sassok did not report directly to Mr. Dilks, who

was DDD's chief executive officer. Sassok Aff. ¶ 6. And, following her departure from DDD in 2002, Ms. Sassok did not have contact with Mr. Dilks until 2006, and then not again until November 2008. Sassok Supp. Aff. ¶ 3. The presumption of regularity that protects government officials in their decision-making roles has not been overcome by this showing of a prior working relationship followed by subsequent infrequent and casual encounters. *See L-3 Commc'ns*, 91 Fed.Cl. at 356 ("bias must rest on strong evidentiary footing"). Moreover, Ms. Sassok's ratings of Pitney Bowes' offer were higher than those of the other two TEP members, and her ratings of Stanley's proposal were lower than those of the other two panelists.[12] Thus, the scoring of the competing proposals also exhibits no sign of bias on Ms. Sassok's part. *See Galen*, 369 F.3d at 1337 (comparing scores in evaluating a bias claim).

## C. Technical Evaluation

■ Pitney Bowes also questions the TEP's technical evaluation of the competing offers, focusing first on the TEP's alleged use of "undisclosed evaluation criteria." Pl.'s Second Mot. for Judgment at 17–18; *see* FAR § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."); *OTI Am., Inc. v. United States*, 68 Fed.Cl. 646, 655 (2005) ("[A]gencies must evaluate proposals and make awards based on the criteria stated in the solicitation." (internal quotation omitted)). Mindful of its role on review, the court will not "evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation." *CCL Serv. Corp. v. United States*, 48 Fed.Cl. 113, 120 (2000) (internal quotation omitted).

### 1. The IDIQ requirement.

■ The contract at issue "include[s] a combination of Firm Fixed Price (FFP) and Labor Hour (LH) contract pricing ... and includes both a Definite Quantity, Definite Delivery portion and an Indefinite Delivery, Indefinite Quantity (IDIQ) portion." AR 1-000002 (Request for Information); AR 8-000247 (Solicitation) (same). Pitney Bowes claims that the TEP's assignment of weaknesses to its technical proposal in areas related to the IDIQ portion of the contract was arbitrary and capricious because it was premised on use of undisclosed evaluative criteria by the TEP—specifically, a requirement that an offeror "have separate sections addressing a specific IDIQ need." Pl.'s Second Mot. for Judgment at 19.

### a. Staffing.

The TEP assigned Pitney Bowes' proposed Staffing Plan a "major weakness" for not providing "specific details ... to support the [* * *]," going on to say that Pitney Bowes' proposal contained "few significant details ... [about] plans for providing [* * *] that will be used to continue the service as required." AR 20–001089 (TEP Report) (emphasis added). In contrast, the TEP listed as "major strengths" of Stanley's Staffing Plan that Stanley had included in its proposal a discussion of "a comprehensive benefit and incentives program to help attract new employees," and a detailed description of available backup personnel consisting of seven fully-trained on-call personnel (in addition to the five backup personnel required by the contract) plus staff obtained from a subcontractor, Kelly Services. AR 20–001081 (TEP Report). The TEP listed as a "minor strength" of Stanley's proposal its "detailed process for recruiting [new personnel]." *Id.* Overall, the record shows that Stanley's proposal addressed staffing in far greater detail than Pitney's proposal, by including, for example, both a section on initial staffing and a

12. A review of the TEP members' individual rating sheets reveals that Ms. Sassok awarded Pitney Bowes its highest individual score—[* * *] out of [* * *]. SAR at 89–90. Ms. Archiopoli and Mr. Gerstell awarded Pitney Bowes scores of [* * *] and [* * *], respectively. SAR at 54 (Archiopoli), 73 (Gerstell). Pitney Bowes was ulti-

mately awarded a score of [* * *]. AR 20–001080 (TEP Report). Ms. Sassok awarded Stanley [* * *] points out of [* * *], its lowest score, SAR at 1–2, whereas Ms. Archiopoli and Mr. Gerstell awarded Stanley [* * *] and [* * *] points, respectively. SAR at 20 (Gerstell), 37 (Archiopoli).

section describing how Stanley would meet DOJ's ongoing staffing needs. AR 17–000934 to 935 (Stanley's Technical Proposal, § 1.2.1.2 (Dec. 22, 2009)). In light of the greater depth in which Stanley addressed staffing, the court cannot say that the TEP acted arbitrarily and capriciously when it gave Pitney Bowes lesser scores in this area for failure to include plans for providing continuing personnel.

### b. *Transition.*

The TEP assigned Pitney Bowes' Transition and Implementation Plan "major weaknesses" for failing (1) to provide specific timelines and specific areas of responsibility for [* * *] regarding transition of certain [* * *] and (2) to "address the need for [* * *] as required in the [Request for Proposal]." AR 20–001090 (TEP Report). The TEP assigned "major strengths" to Stanley's proposal in the same areas for providing a "detailed description of the transition team," identifying "significant transition milestones," and setting out "specific timeframes [as] provide[d] in Figure 1.3–1 Transition Schedule, which shows an overall transition of four weeks which will allow the contractor to begin services as requested in the R[equest for] P[roposal]." AR 20–001081 to 82 (TEP Report). Here also, Stanley's proposal contained a detailed transition schedule that addressed over thirty specific "transition tasks" on a week-by-week basis. AR 17–000941 (Fig. 1.3–1 Stanley's Technical Proposal). In contrast, although Pitney Bowes "provide[d] information regarding transition of certain [* * *], . . . specific timelines [were] not provided." AR 20–001090 (TEP Report). Given the greater level of detail provided by Stanley with regard to transition, especially its provision of a weekly schedule for transition, the court finds that it was not arbitrary and capricious for the panel to find Stanley's proposal to be strong and Pitney Bowes' proposal weak in this area.

### c. *Quality control.*

The TEP listed as a "major weakness" of Pitney Bowes' proposed Quality Control

Plan that "[t]he [* * *] portion of the contract is not mentioned." AR 20–001090 (TEP Report). Pitney Bowes claims the TEP impermissibly required that Pitney Bowes address the IDIQ portion of the contract in their proposed Quality Control Plan separately from the rest of the proposal where there was no specific requirement in the Solicitation that it do so. Pl.'s Second Mot. for Judgment at 18. This contention, however, overlooks the facts that the Solicitation encompassed both the fixed and the IDIQ requirements and Pitney Bowes' Quality Control Plan did not address the IDIQ requirements.[13]

### d. *Synopsis.*

The court finds Pitney Bowes' contentions regarding the scoring of the IDIQ portion of its proposal to be unavailing. The assignment of weaknesses to Pitney Bowes' proposal for its failure to address in depth the IDIQ portion of the contract and the corresponding assignment of strengths to Stanley for doing so is a reflection of the greater detail in which Stanley covered those areas, and not, as Pitney Bowes argues, the imposition of undisclosed evaluation criteria requiring the offerors to in every instance include a separate discussion of the IDIQ portion of the contract. A fair reading of the TEP Report suggests that Pitney Bowes' "weaknesses" lay not with its failure to follow a certain format in its proposal, as Pitney Bowes suggests, but rather, with Pitney Bowes' failure to provide adequate detail in the Staffing, Transition, and Quality Control aspects of its proposal.

### 2. *Backup equipment.*

Pitney Bowes claims the TEP impermissibly downgraded its proposal for not including " 'specific back up [* * *] . . . to meet the requirements of incoming mail sorting, date stamping and tracking of accountable mail' " "[a]s required in the [Solicitation] (Section C.4.2)." Pl.'s Reply and Resp. at 19 (quoting AR 20–001090 (TEP Report)) (emphasis

---

13. The government suggests, and the court is inclined to agree, that Pitney Bowes was aware of the need to address the IDIQ requirements as evidenced by the fact that Pitney Bowes did address the IDIQ portion of the contract in its Transition Plan. *See supra.*

omitted); AR 20–001090 (TEP Report). Pitney Bowes argues that the TEP applied the wrong section of the Solicitation, and that Section C.16 (as contrasted to Section C.4.2) is the applicable section. Pl.'s Reply and Resp. at 19. Section C.4.2 addresses "Mail Operations," encompassing the "Processing of Incoming USPS Mail" picked up from a USPS Facility and transported to the Department's Off Site Mail Facility, "where the mail is x-rayed, date stamped, and primary sort is performed." AR 8–000248 (Solicitation, § C.4.). Specifically, "[a]ccountable mail is sorted, screened and tracked using the contractor provided method as described in Section . . . C.16, [with] Contractor-furnished property." Id. Section C.16 requires that the Contractor provide certain property, including "all vehicles necessary to satisfactorily perform all [contract requirements]," "x-ray equipment to be located in the DOJ Off Site Mail Facility," and "[all] tracking and sorting equipment needed to provide the services described in this contract." AR 8–000283 to 84 (§§ C.16.1–3). The only discernable reference in Section C.16 to backup equipment is in C.16.1, which relates to contractor-provided vehicles. AR 8–000283 (§ C.16.1) ("If a Contractor vehicle is put out of operation . . ., the Contractor shall provide a replacement vehicle within the hour."). The remaining provisions of Section C.16 merely state equipment requirements and do not refer to provision of backup equipment or processes in case of malfunction or other unavailability of the primary equipment or method. See AR 8–000283 to 85 (§ C.16).

In its briefs, Stanley appears to suggest that Sections C.4.2 and C.16 should be read together, with the consequence that "Section C.4.2 of the [Solicitation] put offerors on notice that performance of the contract would require efficient and timely sorting, screening, and tracking of accountable mail

using the contractor-furnished property described in Section C.16 of the [Solicitation]." Stanley's Mot. at 12. Stanley also contends that the reference in Section C.16.1 to "replacement vehicle[s]" put offerors "on notice that performance of the contract required certain contractor-furnished property, which reasonably included equipment and processes to 'back up' the primary components if they failed or were otherwise rendered inoperable." Id.

■■■■ The court concurs with the government that the provision of backup processes and equipment were important to the contractor's performance of its "general obligations to get the work out on time," Hr'g Tr. 56:5, and may well have been implicit in those obligations. However, a careful reading of Section C.16 reveals no explicit reference to backup equipment apart from the requirement stated in Section C.16.1 to provide replacement vehicles.[14] Accordingly, Pitney Bowes' proposal should not have been downgraded for failing specifically to address "back up process[es] or equipment . . . to meet the requirements of incoming mail sorting, date stamping and tracking of accountable mail." AR 20–001090 (TEP Report). Moreover, Pitney Bowes did address "back-up capability to the primary X-ray system," proposing that DOJ employ both a[* * *], and a[* * *] machine "specifically designed to handle palletized materials" even though "[* * *] machines do provide a degree of redundancy," stating, "[S]hould the [* * *] become inoperable, the [* * *] could be used to continue day-to-day screening while the [* * *] was being repaired . . . [and] [s]hould the [* * *] machine become inoperative, any palletized material received during repairs could be screened individually through the [* * *]." AR 15–000774 to 76 (Pitney Bowes'

14. Although the provision of replacement vehicles was an explicit requirement in the Solicitation, in their competing offers neither Pitney Bowes nor Stanley addressed how the company would deal with a malfunctioning or otherwise unavailable vehicle. See AR 15–000782 (Pitney Bowes' Technical Proposal) (describing a "propos[ed] . . . base fleet of [* * *] composed of [* * *] . . . [to] fully satisfy the firm fixed price route requirements," without mentioning vehicle replacement); AR 17–000949 (Stanley's Techni-

cal Proposal, Fig. 1.3.7.1.1–4) (proposing to furnish new vehicles, consisting of "2 International 4300 box trucks and 6 Ford E–150 vans" "to provide reliable, on-time transportation for DOJ mail," without addressing Stanley's ability to provide replacement vehicles within one hour as required in the Solicitation). Because neither Stanley nor Pitney Bowes were assigned weaknesses for failing to deal with the replacement-vehicle requirement, both were treated equally by the panel in this respect.

Technical Proposal, § 1.3.4.1). Notably, Stanley's proposal should have been assigned a weakness in this area, as Stanley addressed neither backup capability for the X-ray system, nor for sorting, date stamping, and tracking accountable mail. *See* AR 17–000947 to 52 (Stanley's Technical Proposal, § 1.3.7.1). The TEP's failure to downgrade Stanley in this regard constitutes unequal treatment of the two competing proposals. However, the court finds the TEP's error to be harmless because it would not have affected the award of the contract to Stanley, which won the procurement by a considerably greater margin than the adjustment that should have been made for this factor. *See* AR 20–001080 (TEP Report, Tbl. 4) (showing that Pitney Bowes' proposal scored [* * *] points lower than Stanley's proposal); Hr'g Tr. 45:18–23 (Pitney Bowes had a $[* * *] million higher price).

### 3. *Past performance.*

Pitney Bowes also finds fault with the TEP's evaluation of its past performance under the current contract and under other contracts with the House of Representatives and the Environment and Natural Resources Division of the Department. Relying on personal knowledge and the information provided by customers on "past performance questionnaires," the TEP found "major weaknesses" in Pitney Bowes' history of quality of services, timeliness of performance, price and cost control, and customer satisfaction. AR 20–001092 to 93 (TEP Report). The panel described Pitney Bowes' history of timely performance in critical fashion: "A [c]ustomer[-]provided past performance response for Pitney Bowes stated that required monthly reporting and invoicing [were] not always on time . . ., [and] over the past two years [on the current DOJ contract], there have been delays in processing mail, bringing on replacement and new contractors and providing the monthly invoice on-time." *Id.*

 Pitney Bowes' primary objections to the TEP's evaluation of its past performance focuses on the TEP's reliance on personal knowledge about Pitney Bowes' performance as the incumbent on the existing contract: "[T]he TEP did not consider any written documentation . . . but [TEP members] relied upon their own personal knowledge to assess [Pitney Bowes'] performance," and "nothing in the [administrative record] supports the TEP's conclusions regarding the past performance on the current . . . contract." Pl.'s Second Mot. for Judgment at 27. This argument overlooks, however, the fact that all three voting members of the TEP worked on the current contract and had personal knowledge of Pitney Bowes' performance of its obligations under that contract. *See* Def.'s Cross–Mot. at 28. Drawing upon personal knowledge to evaluate past performance is permissible. *See, e.g., Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. 560, 568 (2000) ("[I]t has been repeatedly held that it is proper for evaluators to use their personal knowledge of an offeror's performance of a contract with an agency.") (citing *Inlingua Schs. of Languages,* B–229784, 88–1 CPD ¶ 340, 1988 WL 227429, at *3 (Comp.Gen. Apr.5, 1988)); *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 842 n. 54 (1999) (finding the Technical Evaluation Committee "correctly incorporated their personal knowledge of proposed key personnel of the offerors into their evaluations" and that it was proper for one evaluator with "direct knowledge" of an offeror's past performance to downgrade his evaluation score based on that knowledge). In this instance, reliance on personal knowledge was explicitly authorized by the contracting officer. AR 19–001070 (Mem. from Contracting Officer Shivers to Ms. Sassok (Jan. 4, 2010)) ("[P]ersonal knowledge of the firm may be used in connection with evaluating a firm['s] past performance."). Pitney Bowes' challenge to the TEP's evaluation of its past performance under the current contract is therefore without merit.

 With regard to the TEP's evaluation of Pitney Bowes' performance under its other contracts with the House of Representatives and the Department's Environment and Natural Resources Division, Pitney Bowes appears to object to the panel's use of and reliance on reference questionnaires distributed to these other customers on the ground that "none of [the members of the

panel] could show any evidence in the record regarding how they reviewed the questionnaires—they just represented that they 'did.'" Pl.'s Second Mot. for Judgment at 26. However, "there is nothing inherently wrong with an agency using a survey, telephone interview, or questionnaire to elicit information regarding past performance. To the contrary, a review of agency regulations, *see, e.g.,* 48 C.F.R. [ ('FAR') ] § 1815.304–70(d)(3) (1999), not to mention decisional law, suggests that such surveying has been frequently employed without objection." *Serco Inc. v. United States,* 81 Fed.Cl. 463, 483 (2008). Nonetheless, the use of past performance reports must comply with the "fundamental principle of federal procurement law that a contracting agency must treat all offerors equally and evaluate their proposals evenhandedly against the solicitation's requirements and evaluation criteria." *Brican Inc.,* B402602, 2010 CPD ¶ 141, 2010 WL 2474031, at *4 (Comp.Gen. (June 17, 2010)) (sustaining protest where the agency did not reasonably evaluate the awardee's proposal under the past performance factor when it concluded that the awardee had completed five projects of similar size, scope, and complexity where in reality the awardee's proposal only identified two relevant projects, one of which was incomplete at the time of the award). Here, however, Pitney Bowes has not made a sufficient showing that it was treated differently from the other offerors by the panel with regard to the panel's evaluation of Pitney Bowes' past performance of other contracts.[15] Accordingly, the panel's use of customer-provided past performance responses to evaluate Pitney's past performance under other contracts was proper.

### 4. *Employees.*

██ As a final point of contention, Pitney Bowes alleges that the TEP treated it and Stanley unequally by "reward[ing] Stanley, but not [Pitney Bowes], for proposing the same exact employees that [Pitney Bowes] proposed." Pl.'s Reply and Resp. at 21. Specifically, Pitney points to the fact that DOJ awarded Stanley [* * *] points (the maximum number of points) under the physical and personnel security factor, but only awarded Pitney [* * *] points, even though Stanley "proposed to use 95% of [Pitney Bowes]' employees to perform the contract." Pl.'s Second Mot. for Judgment at 26 (citing AR 17–000934 (Stanley's Technical Proposal, § 1.2.1.1) (stating "we expect to hire approximately 95 percent of the incumbent workforce")). The TEP Report indicates that Stanley proffered a larger workforce comprised of [* * *] individuals in the D.C. area, [* * *] of which would have secret or top secret clearances, to meet the contract requirements. *See* AR 20–001080 (TEP Report); AR 17–000932 (Stanley's Technical Proposal, Fig. 1.1.2–1).

The TEP's conclusion about employees is borne out by the record. Pitney Bowes nonetheless argues that the TEP treated it and Stanley unequally in that the TEP credited Stanley's "assumption" that it could feasibly transfer existing employees with clearances to the Department's work sites even though the transfer would entail at the very least security clearance processing for the transferred individuals and some level of "time and expense." Pl.'s Reply and Resp. at 21–22 (citing AR 17–000932 (Stanley's Technical Proposal, § 1.1.2)). However, the TEP showed that it was well aware that Stanley proposed to hire large numbers of Pitney Bowes' employees who were working on the current contract and potentially to transfer current Stanley employees from other projects to the Department's work sites. The TEP acted reasonably in taking that hiring and those transfers into account in evaluating Stanley's proposal. Pitney Bowes has failed to show that the panel acted arbitrarily and capriciously when it found Stanley's proposal to be the most competitive in this area.

The court has reviewed Pitney Bowes' remaining contentions and finds those arguments to be unpersuasive as well.

### CONCLUSION

For the reasons stated, Pitney Bowes' motion for judgment on the administrative rec-

---

15. That panel members might have used different criteria in their individual review of the past performance questionnaires is not significant because the results of each panel member's review appears to have been consistent from offeror to offeror.

ord is DENIED. The government's and Stanley's motions for judgment on the administrative record are GRANTED. The clerk shall enter judgment for the government and Stanley in accord with this decision. No costs.

The parties were requested to review this decision and to file proposed redactions on or before August 18, 2010.

It is so ORDERED.